**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| HENRY FELT and DIANE FELT, | Civil Action No.: _____ |
| Plaintiffs, | |
| v. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| CHERYL W. GRISE, CARLOS M. GUITIERREZ, DAVID L. HERZOG, R. GLENN HUBBARD, PH.D., STEVE A. KANDARIAN, EDWARD J. KELLY, III, GERALD L. HASSELL, WILLIAM E. KENNARD, HUGH B. PRICE, JAMES M. KILTS, CATHERINE R. KINNEY, DENISE M. MORRISON, JOHN C. R. HELE, MARIA R. MORRIS, STEVEN J. GOULART, KENTON J. SICCHITANO, ALFRED F. KELLY, JR., LULU L. WANG, JOHN M. KEANE, WILLIAM A. WHEELER, ROBIN LENNA and WAYNE DANIEL, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| -and- | |
| METLIFE, INC., | |
| Nominal Defendant. | |

Plaintiffs Henry Felt and Diane Felt on behalf of MetLife, Inc. ("MetLife" or the "Company"), by Plaintiffs' undersigned attorneys, for Plaintiffs' shareholder derivative complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of documents produced pursuant to a demand for

inspection under Delaware General Corporate Law § 220, Securities and Exchange Commission ("SEC") filings by MetLife, filings in *In the Matter of MetLife, Inc.*, Docket No. E-2017-2019 (Mass. Securities Div.), regulatory settlements between MetLife and various state insurance regulators in 2012 as well as media and analyst reports about the Company and transcripts of hearings by regulators of the status of Florida and California and evidence and facts made public in the actions entitled *City of Westland Police and Fire Retirement System v. MetLife, Inc., et al.*, No. 12-cv-00256-LAK (S.D.N.Y.) (the "2012 Litigation") and *Parchmann v. MetLife, Inc, et al*, No. 18-cv-007380-SJ-RLM (E.D.N.Y.).

## I.

## <u>NATURE OF THE ACTION</u>

1.      This is a shareholder derivative action under Fed. R. Civ. P. 23.1, seeking to hold accountable the Individual Defendants named herein for damages and loss to MetLife from their violation of fiduciary duties owned to MetLife and their violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      On December 15, 2017, MetLife representatives announced in an Investor Outlook Call that MetLife was reviewing "practices and procedures" used to estimate its reserves related to certain Retirement and Income Solutions ("RIS") group annuitants (hereafter "Pension Risk Transfer Annuitants" or "PRTAs"). The Company described the issue as one of an inability to "locate" a certain group of annuitants, approximately 600,000 annuitants who MetLife could not reach "via the information provided for them."  Because MetLife was unable to "locate" a PRTA, MetLife erroneously categorized them as deceased and released the applicable reserves into earnings thereby increasing reported earnings and allowing achievement of targets for executive bonuses.

2

3.     On January 29, 2017, the Company issued a press release wherein it rescheduled its earnings release for two weeks and estimated a reserve increase of between $525 million and $575 million pre-tax.  On that news, MetLife stock dropped 11.6%, to $47.67 per share.

4.     On February 13, 2017, MetLife reported its financial results and announced that the Company had been forced to increase its reserves by over $500 million due to its failure to properly account for liabilities for incurred but unpaid annuity payments.  MetLife was required to increase reserves due to its improper release of reserves in earlier years.  MetLife has admitted that both its internal controls and communications and reporting systems were/are defective.

5.     The issues disclosed in late 2017 and early 2018 by MetLife with respect to not locating PTRAs and the related problems of financial controls, financial reporting, and reserves are similar to previous issues involving MetLife's failure to "locate" and make payments to beneficiaries of life policies and failure to comply with various state's escheatment laws.  In 2009, various state insurance regulators began to investigate MetLife's apparent failures to adequately search for and compensate beneficiaries of life insurance and annuity products who were owed benefits.  These "failures" allowed MetLife to keep the benefits and thereby report increased earnings but in the eyes of various states insurance and banking departments, constituted violations of law.  Multi-state investigations ensued by the states of Florida, Illinois, Pennsylvania, New Hampshire, North Dakota and New York.  MetLife booked a $143 million charge to earnings in late 2011 to account for liabilities in excess of reserves precipitating a steep decline in MetLife stock price from $36.90 in early August 2011, to $28.80 in early October 2011.  In April 2012, MetLife settled the investigations, paid fines and costs to state regulators, revised earnings and made payouts totaling over one half billion dollars.  In addition, MetLife was ordered to implement tighter, better internal controls but MetLife failed to extend any

improved internal controls to the pension risk transfer business or PRTAs.  In the Regulatory Settlement Agreement ("RSA") between MetLife and the various states, MetLife also agreed to corporate reforms and agreed further to subject itself to enforcement action for failure to comply with the agreement's terms.  The RSA has numerous provisions requiring establishment of policies and procedures for identification of annuitants to ensure that benefits are properly paid to beneficiaries or that the applicable "Unclaimed Property Laws" of the appropriate states are complied with.

6.      Because the processes and procedures mandated by regulators in 2012-2013 were not extended to the pension risk transfer business or PRTAs, five years later, 2017 MetLife had to once again restate its financial results to make them accurately reflect MetLife's true financial condition and results of operations from at least 2011 through the end of 2017.  The restatement was necessary to correct for MetLife's release of reserves for liabilities for PTRAs who were erroneously categorized as dead.  The yearly artificial boost to earnings from the reserves erroneously released triggered tremendous bonus compensation to the MetLife officers named as Defendants herein.  Those serious financial and operational issues that were merely a repeat of the issues surfaced in 2009 in another segment of MetLife's operations (resulting in 2012 in settlements and fines costing MetLife in excess of $500 million) that would not have occurred if the director and officers named herein as Defendants had faithfully, loyally and competently executed their fiduciary duties and duties of their respective offices and extended the regulator – mandated reforms to the pension risk transfer business.

## II.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to its federal question jurisdiction under 28 U.S.C. § 1331, diversity jurisdiction under 28 U.S.C. § 1332(a)(2)

and supplemental jurisdiction under 28 U.S.C. § 1367(a). Plaintiffs are residents of New Jersey. Defendant MetLife is incorporated in the State of Delaware and has its principal place of business in the State of New York.

8.      The amount in controversy is unknown but is believed to be in the hundreds of millions of dollars.

9.      This Court has personal jurisdiction over Defendants because they each do business in and have significant contacts with this District.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and because MetLife's Charter includes an exclusive forum provision whereby this action is required to be filed in a state or federal court located within the State of Delaware.

11.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.

## THE PARTIES

### A.      Plaintiffs

12.     Plaintiffs Henry Felt and Diane Felt owned and continue to own MetLife common stock at all relevant times to this action.

### B.      The Nominal Defendant

13.     Nominal Defendant MetLife is a global provider of insurance, annuities and employee benefit programs, serving 90 million customers in over 60 countries. According to the Company, MetLife holds leading market positions in the United States, Japan, Latin America,

Asia Pacific, Europe and the Middle East.  The Company is headquartered in New York, New York and trades on the NYSE under ticker symbol "MET."

## C.      **The Current Directors Named As Defendants**[1]

14.      Defendant Steven A. Kandarian ("Kandarian") is and has been since May 1, 2011, the Company's President and CEO.  He has been named herein as a Current Director Defendant and Officer Defendant.   Prior to May 1, 2011, Kandarian served as the Company's Chief Investment Officer.  In 2013, 2014, 2015, 2016 and 2017, respectively, Defendant Kandarian's compensation was:   $14.6 million; $15.1 million; $15.7 million; $15.28 million; and $14.73 million.

15.      Defendant Cheryl W. Grise ("Grise") is and was a member of the Board of Directors at all relevant times has been a Director of the Company since February 2004.  During her tenure as a board member, Grise served on the Audit, Compensation and Governance and Corporate Responsibility Committees of the Board of Directors.

16.      Defendant Carlos M. Guitierrez ("Guitierrez") has been a director since April 2013.

17.      Defendant David L. Herzog ("Herzog") has been director since April 2016 and a member of the Audit Committee.

18.      Defendant R. Glenn Hubbard ("Hubbard") is now and has been a member of the Board of Directors at all relevant times since 2007, Hubbard has served on the Finance and Risk Committee of the Board of Directors.  In 2017, Hubbard became MetLife's "Lead Director."

19.      Defendant Edward J. Kelly, III ("Kelly III") has been a director since April 2015 and a member of the Audit Committee.

---

[1]      Current Directors Gerald L. Hassell and Diana McKenzie are not named as Defendants because they only joined MetLife's Board in 2018.

20.     Defendant William E. Kennard ("Kennard") has been a director since 2013.

21.     Defendant Catherine R. Kinney ("Kinney") has been a director since 2009.  Since 2013, she has been a member the Board's Audit Committee and Finance and Risk Committee.

22.     Defendant James M. Kilts ("Kilts") is and has been since 2005, a member of the Board of Directors.  Kilts has served on MetLife's Compensation Committee.

23.     Defendant Denise M. Morrison ("Morrison") has been a director since 2014.

24.     During 2013 through 2017, the members of the Audit Committee were, at various times Defendants Grise (2013-2017); Defendant Keane (2013); Defendant Kelly, Jr. (2013-2017); Defendant Kelly, III (2015-2017); Defendant Kinney (2013-2017); Defendant Price (2013); Defendant Sicchitano (2013-2015); Defendant Herzog (2016-2017) (the "Audit Committee Defendants").

25.     Defendants Grise, Hassell, Herzog, Kelly III, Kilts and Morrison are sometimes also referred to as the "Compensation Committee Defendants."

26.     Defendants Hassell, Herzog, Kelly, Jr. Sicchitano, Kelly, III, Kennard, Kinney, and Hubbard are sometimes also referred to herein as the "Finance Risk Committee Defendants."

**D.     The Former Director Defendants**

27.     Defendant Alfred F. Kelly, Jr. ("Kelly, Jr.") was a director from 2009 through 2018.

28.     Defendant Kenton J. Sicchitano ("Sicchitano") was a director from 2003 through 2016.

29.     Defendant Lulu L. Wang ("Wang") was a director from 2008 through 2016.

30.     Defendant John M. Keane ("Keane") was a director from 2003 through 2014.

31.     Defendant Hugh B. Price was a director from 2003 through 2014.  He was a member of the Audit Committee in 2013.

**E.     The Officer Defendants**

32.     Defendant William A. Wheeler ("Wheeler") was President, U.S. Businesses, from at least 2011 through approximately 2015.  His area of responsibilities included the pension risk unit.  In 2013, 2014, and 2015, his total compensation was $6,956, 009, $5,321,000 and $5,351,516, respectively.

33.     Defendant John C. R. Hele ("Hele") was MetLife's Executive Vice President and Chief Financial Officer from 2013 through 2017 respectively he was paid $2.8 million; $5.57 million; $5.9 million and $5.3 million.

34.     Defendant Steven J. Goulart ("Goulart") was MetLife's Executive Vice President and Chief Investment Officer and from 2015 through 2017, he was paid $4.07 million; $4.64 million; $4.8 million respectively.

35.     Defendant Maria Morris ("Morris") replaced Defendant Wheeler as head of MetLife's U.S. business from April 2015 through June 2017.

36.     Defendant Robin Lenna ("Lenna") was an Executive Vice President who oversaw MetLife's RIS business and its previous unit known as the "CBF" business.

37.     Defendant Wayne Daniel ("Daniel") was MetLife's Vice President of U.S. Pensions overseeing the pension risk transfer business.  He was appointed in March 2014 and served in that position through December 2017.  He reported to Lenna throughout that period.

**F.    Director's Duties Generally And As Members Of Relevant
Committees With Responsibility For Matters That
<u>Led To MetLife's Inflated Earnings And Regulatory Problems</u>**

38.    MetLife has six standing Board Committees at present.  The relevant committees

for this case are the Audit Committee, Compensation Committee and the Finance and Risk

Committee.

### 1.    <u>Audit Committee</u>

39.    In 2014, Sicchitano was Chairman of the Audit Committee and Defendants Grise,

Keane, Kelly, Jr. and Kinney were members thereof.

40.    In 2013, Defendants Grise, Keane, Kelly, Jr., Kinney, Herzog and Price were

members of MetLife's Audit Committee.

41.    In 2019, 2015, 2016, Defendant Kenton J. Sicchitano was the Chairman of the

Audit Committee and Defendants Grise, Herzog, Kelly, III and Kinney were members thereof.

42.    In 2015 Defendant Sicchitano was Chairman of the Audit Committee and

Defendants Grise, Kelly, Jr., Kelly III and Kinney were members of the Audit Committee.

43.    Defendants Grise, Herzog, Kelly III and Kinney were members of the Audit

Committee in 2014, 2015 and 2016.

44.    MetLife's Audit Committee was described in its 2018 Proxy Statement as:

> "oversees the Company's compliance with legal and regulatory
> requirements, reviews the Company's policies on ethical conduct
> and periodically discusses the guideline and policies with respect
> to the process by which the Company undertakes risk assessment
> and management . . . the Audit Committee also reviews with
> management, the internal auditor and the independent auditor, the
> Company's system of internal control over financial reporting that
> is relied upon to provide reasonable assurance of the integrity of
> the Company's financial statements.

45.     MetLife's Audit Committee Charter effective October 23, 2018 states in relevant part:

**Committee Authority and Responsibilities**

In carrying out its responsibilities, the Committee shall:

\*   \*   \*

With respect to the Company's internal control over financial reporting, the Committee shall review and discuss with management, the internal auditor and the independent auditor:

Management's reports evaluating the adequacy and effectiveness of the Company's internal control over financial reporting, including any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting that could adversely affect the Company's ability to record, process, summarize and report financial information.

The independent auditor's reports concerning the adequacy and effectiveness of the Company's internal control over financial reporting.

Management's reports concerning the prevention and detection of fraud against the Company, including reports of any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

Regular updates from management, the internal auditor and the independent auditor regarding status of any remediation plans for any material weaknesses and significant deficiencies in the design and operation of internal control over financial reporting.

\*       \*       \*

With respect to the Company's internal control over financial reporting, the Committee shall review and discuss with management, the internal auditor and the independent auditor:

•       Management's reports evaluating the adequacy and effectiveness of the Company's internal control over financial reporting, including any significant deficiencies or material weaknesses in the design or operation of

internal control over financial reporting that could adversely affect the Company's ability to record, process, summarize and report financial information.

- The independent auditor's reports concerning the adequacy and effectiveness of the Company's internal control over financial reporting.

- Management's reports concerning the prevention and detection of fraud against the Company, including reports of any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

- Regular updates from management, the internal auditor and the independent auditor regarding status of any remediation plans for any material weaknesses and significant deficiencies in the design and operation of internal control over financial reporting.

With respect to the Company's financial statements and disclosures of financial information, the Committee shall:

- Discuss with the independent auditor, and with the internal auditor, in each case out of the presence of management if deemed appropriate ... (b) the Company's internal control over financial reporting, and the budget, staffing and quality of the Company's internal audit function; and (c) any "management" or "internal control" letter issued or proposed to be issued by such auditor to the Company, and management's response thereto.

*       *       *

- Review any material financial or other arrangements of the Company that do not appear on the Company's financial statements, any reports by management, the internal auditor or the independent auditor regarding any such arrangements of the Company that do not appear on the Company's financial statements, and any transactions or courses of dealing with third parties that are significant in size or involve tenues or other aspects that differ from those that would likely be negotiated with independent parties, and that are relevant to an understanding of the Company's financial statements.

- Review management's reports evaluating the effectiveness of the Company's disclosure controls and procedures in assuring that material information required to be disclosed in the Company's periodic reports filed with the Commission is reported to management, appropriately processed and summarized by management and reflected in such reports filed with the Commission within the specified time periods.

- Discuss with management, the internal auditor and the independent auditor the Company's quarterly reports on Form l0-Q and the interim financial information contained therein, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," or authorize the Committee Chair to discuss the foregoing with management, the internal auditor and the independent auditor and make a report thereon to the full Committee, prior to the filing of such quarterly reports with the Commission.

- Discuss with management the Company's practices regarding earnings press releases as well as the financial information and earnings guidance management provides to analysts and rating agencies.

- Discuss with management, the internal auditor and the independent auditor the audited financial statements to be included in the Company's annual reports on Form l0-K, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to the filing of such reports with the Commission and discuss with the independent auditor the matters required to be discussed by the applicable PCAOB standards.

- Based on its discussions with management, the internal auditor and the independent auditor and upon receipt of an opinion of the Company's independent auditor on the Company's financial statements, in form and content satisfactory to the Committee, determine whether to recommend to the Board that the Company's audited financial statements be included in the Company's Annual Reports on Form 10-K for filing with the Commission.

The Committee also shall:

- Periodically discuss the guidelines and policies with respect to the process by which the Company undertakes risk assessment and risk management.

- Review the financial condition of the Company.

- Review with management, the internal auditor and the independent auditor any correspondence with regulators or governmental agencies and any employee complaints or published reports that are brought to its attention that raise material issues regarding the Company's financial statements or accounting policies.

- Receive reports from the Company's General Counsel concerning significant legal and regulatory matters.

- Review the Company's policies on ethical business conduct and review reports concerning the monitoring of compliance with such policies.

2. **Compensation Committee Charter**

46.    The Compensation Committee approves the goals and objectives relevant to the Chief Executive Officer's Total Compensation, evaluates the Chief Executive Officer's performance in light of such goals and objectives, and recommends, for approval by the Independent Directors, the Chief Executive Officer's Total Compensation level based on such evaluation; oversees management's efforts to mitigate risks associated with the development and administration of the Company's compensation programs, including efforts to ensure that the Company's incentive plans do not encourage or reward excessive risk taking; and reviews and discusses with management the Compensation Discussion and Analysis to be included in the proxy statement.

47.     MetLife's Compensation Committee Charter provides, in relevant part:

**Role of the Compensation Committee**

The Compensation Committee (the Committee) is appointed by the MetLife, Inc. (the Company) Board of Directors (the Board) to assist the Board in fulfilling its responsibility to oversee the compensation of the Company's executive officers and other employees of the MetLife enterprise.

. . . .

**Committee Authority and Responsibilities**

In carrying out its responsibilities, the Committee shall:

. . . .

6.      oversee management's efforts to ensure that the Company's compensation programs do not encourage excessive or inappropriate risk-taking;

7.      periodically review the Company's Performance-Based Compensation Recoupment Policy, amend the policy as if deems appropriate, and oversee it application.

48.     The Compensation Committee also has the duty and authority to enforce MetLife's "Performance Based Compensation Recoupment Policy." Its stated purpose is to ". . . seek Recoupment of performance based compensation" . . . ". . . if the Company determines that an Employee engaged directly or indirectly in, or contributed to, fraudulent or other wrongful conduct by action or omission, including by failure to properly supervise, that caused financial or reputational harm to MetLife . . . then the Company or any affiliate may seek the Recoupment of Performance-based compensation that was or otherwise would be awarded to, credited, earned by, or paid to that Employee during or after the period of such conduct or that resulted from such misconduct."

### 3. The Finance And Risk Committee

49.     MetLife's Finance and Risk Committee (according to MetLife's annual proxy statement and website) ". . . has broad oversight responsibilities for the Company's risk management.  The Committee oversee the Company's financial policies and strategies, risk targets and risk positions, capital planning and adequacy, certain capital actions, mergers and acquisition projects, and other financial matters" and "oversees the Company's financial policies and strategies; its capital structure, plans and policies, including capital adequacy, dividend policies and share issuances and repurchases; its proposals on certain capital actions, strategic actions and other financial matters; and its assessment and management of material risks."

### 4. Other MetLife Rules And Codes Of Conduct

50.     The Defendants named herein were also subject to MetLife's own codes of conduct:  (a) Directors' Code of Business Conduct and Ethics; (b) Code of Conduct (for employees); and (c) Financial Management Code of Professional Conduct.  In its 2018 Proxy, MetLife states that the Directors' Code of Business Conduct and Ethics applies to all members of the Company's Board of Directors including the Chief Executive Officer.  It also states that it's "The Code of Conduct applies to all Officer Defendants named herein.  MetLife's Financial Management Code of Professional Conduct applies specifically to Defendants Kandarian and Hele to the Company's Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer and all professionals in finance and finance-related departments.

### (a) Directors' Code of Business Conduct and Ethics

51.     MetLife's Directors' Code of Business Conduct and Ethics ("Directors' Code of Conduct") was adopted on January 21, 2004.

52.     The Directors' Code of Conduct provides in relevant part:

MetLife Directors have a responsibility to lead by example, acting with truth, sincerity and fairness in all decisions.

\*       \*       \*

Each Director is expected to comply with the letter and spirit of this Code.

\*       \*       \*

**Compliance Procedures**

Directors shall communicate any suspected violations of this Code, including any violation of law or governmental rule or regulation, promptly to the General Counsel.  Alleged violations shall be investigated by the Board or by a person or persons designated by the Board and appropriate action shall be taken in the event of any violations of the Code.

53.     The Directors Code of Conduct requires annual certification by each Director.

**(b)     Code of Conduct**

54.     MetLife's Code of Conduct ("Code of Conduct") applied to all of the Officer Defendants.  This Code of Conduct provides in relevant part:

**The Code and the Law**

\*       \*       \*

As a MetLife employee, you have a responsibility to:

Be knowledgeable about and follow all policies that affect your work responsibilities.

Be aware of the legal and regulatory requirements of the country and region where you work and that affect your business.

Disclose or raise concerns about any potential violations of law or policy, or any other potential issues, consistent with requirements of local law.

(c)  **Financial Management Code of Professional Conduct**

55.     MetLife's Financial Management Code of Professional Conduct ("Financial Code of Conduct") appears on its website and applies specifically to Defendants Hele and Kandarian.

56.     The Financial Code of Conduct provides in relevant part:

> This Code of Professional Conduct applies to the Chief Executive Officer, the Chief Financial Officer, the Chief Accounting Officer, the Corporate Controller, the Financial Officers and Controllers of each business unit, and all professionals in a finance, accounting, treasury, tax, actuarial, audit or investor relations role in the MetLife enterprise.  Such professionals are expected to adhere to this Code, take personal responsibility for conducting the business endeavors of MetLife fairly, promote a culture of honesty and accountability, and act and advocate that others act in conformity with the core values of MetLife and this Code.  These professionals are also expected to adhere to the MetLife Employee Code of Business Conduct and Ethics as well as all other applicable MetLife policies and guidelines.

> Every employee involved in financial management in the MetLife enterprise shall:

> • Act honestly and ethically, avoid or resolve actual or apparent conflicts of interest in personal and professional relationships, and promptly disclose any material transaction or relationship that reasonably could be expected to give rise to such a conflict of interest to the General Counselor as provided in the Employee Code of Business Conduct and Ethics.

> • Promote and provide appropriate disclosures to stakeholders that present fairly the information therein (e.g., accurately, completely, objectively, relevantly, timely and understandably), in accordance with applicable laws, rules and regulations.

> • Comply with applicable laws, rules and regulations of federal, state, foreign and local

> governments, and private and public regulatory agencies.

> • Adhere to, and, where applicable, monitor and improve, MetLife's processes to maintain effective internal control over financial reporting.

> • Act in good faith, responsibly, with due care, competence and diligence, using considered, professional, independent judgment, and seek at all times to present all reasonably available material information on a timely basis to management and others in accordance with MetLife policies.

57.     The tasks of formulating, implementing and monitoring the regulator – mandated reforms to MetLife processes and internal controls fell within the jurisdiction of MetLife's Audit Committee and Finance and Risk Committees as reflected by express terms of those respective Committee charters described above.

58.     Defendants failures and/or conscious decisions to fail/refuse to implement the regulator-mandated remedial measures to MetLife's pension risk transfer business were deviations from, and/or violations of the standards and mandates of MetLife's Audit Committee Charter and Finance and Risk Committee mandates and amply demonstrate not merely a systemic failure of oversight but also reflects a dereliction and abdication of their duties to exercise committee authority and take affirmative action as allowed under the Audit Committee and Finance Risk Committee charters and/or guides.

59.     In addition, the acts and omissions of the directors and officers as detailed herein also violated the spirit and letter of the Directors Code, and the Code of Conduct and the Financial Management Code.

## IV.

## FACTUAL ALLEGATIONS

### A.      RIS Is A Major Part Of MetLife Business

60.      MetLife's U.S. operations have been by far MetLife's largest contributor to operating earnings constituting approximately 35% of the operating earnings.  The U.S. business segment is organized into three businesses:  Group Benefits, Retirement and Income Solutions and Property and Casualty.  The problems afflicting MetLife after the 2012 Settlement resided in the Retirement and Income Solution ("RIS") segment.   MetLife itself acknowledged in its Annual Report on Form 10-K for the annual period ended December 31, 2017 that "an overall increase in sales from our U.S. segment was primarily driven by improved sales in our RIS division.

61.      According to Defendant Daniel, head of MetLife's U.S. Pensions, this type of risk management has been a "core element" of Met Life's business for over 90 years, with the Company boasting a 45% share of the market for group annuities and similar risk mitigation strategies relevant to employee pension plans.[2]

62.      The pension risk transfer business, out of which MetLife's current problems arise, has been part of MetLife's business since 1921.  In or about October 2016, when MetLife underwent a corporate reorganization, the pension risk transfer business became part of a new unit – "RIS."  The RIS business head, Defendant Lenna reported to the head of MetLife's U.S. Business, Defendant Wheeler, until 2015, when he was replaced by Defendant Morris, until June 2017 when she was replaced by Michel Khalaf.  The pension risk transfer business was headed from March 2014 by Daniel, who reported to Lenna.

---

[2]          http:www.plansponsor.com/thought-leadership/pension-perspective.

63.     By June 2016, as publicly stated by Defendant Lenna, MetLife was managing approximately $38 billion of transferred pension liabilities. Defendant Daniel publicly announced that pension risk transfer was "a core element of MetLife's business" and "MetLife has 45%" market share and is a leading pension risk transfer provider."

64.     Other Defendants "talked up" MetLife's pension risk transfer business repeatedly at investor conferences throughout the years in statements that were publicly reported and therefore were known to, or should have been known to MetLife's directors. For example, during an investor conference call on September 6, 2017, Defendant Hele stated that "the other business that gets a lot of attention is the pension risk transfer business. . . . We like business, it's a solid business. . . . We've been selling roughly between $1.5 billion to $2 billion a year in that. And we appear – we would think we're kind of on track for that range for this year as well. So we like the business." Likewise, Defendant Kandarian stated during an investor conference call on February 13, 2014, that "[Pension risk transfers] is a sector that MetLife has been a major player is historically. *We were the largest again last year in 2013 in terms of the pension closeout business*." And Defendant Wheeler echoed these sentiments during a separate investor conference call on February 13, 2014, stating that "We did I think $1.7 billion, $1.8 billion in pension closeouts in 2013. By the way, *that made us the market share leader in 2013 . . . .* We do see this as an area of growth. And I think – in the US and I think that is going to continue for quite some time."

## B.     Specific Characteristics And Relevant Issues Of MetLife's RIS Business

65.     MetLife is one of the leading providers of pension risk transfer services and products in the United States, marketing them to employers as a risk mitigation strategy. More specifically, when an employer transfers its pension liabilities for some or all of its pension plan

participants through one of MetLife's GACs, MetLife assumes complete responsibility for payment of the benefits to retirees, thus eliminating the employers' administrative burdens and assuming all liabilities for paying pension benefits. To avoid future pension liabilities and administration of pensions, many companies engaged MetLife's pension risk transfer services, to pay out annuity benefits to covered employees.

66.     When a pension risk transfer agreement is entered into, MetLife recognizes revenues but must also establish a liability, *i.e.*, an accounting reserve, to account for the future policy benefits that MetLife must pay to pension annuitants. If MetLife determines that pension risk transfer annuitant has died, thereby terminating the Company's obligation to pay additional pension benefits to this person, MetLife can reduce the liability, *i.e.* "release" its reserves into "income." Accordingly, MetLife can increase its earnings commensurate with the reduction in its future pension benefits liability. Defendants knew, or recklessly disregarded, a flawed and antiquated practice of sending pension risk transfer annuitants two form letters, five years apart, and declaring those who failed to respond as presumed dead, meaning that the Company could release the reserves held for them. MetLife's executive officers nor directors required MetLife to extend the regulator mandated processes and procedures to the pension risk transfer business or PRTAs.

### C.      Prior Adverse Experience With MetLife's Insurance Business Foreshadowed The Annuity Problems

67.     The process described above was previously also used by MetLife with respect to life insurance benefits.

68.     However, by 2011, MetLife had been the subject of a three-year investigation involving more than 30 states that centered on accusations that the Company "lost track" of

thousands of deceased individuals with MetLife life insurance policies and/or their beneficiaries and retained unclaimed life insurance payouts, thereby artificially increasing MetLife earnings.

69.   MetLife settled the unpaid death benefit matter in 2012 by agreeing to make settlement payments to pay 22 states, including California, Illinois, Florida, and Pennsylvania.  A separate settlement was made with the State of New York.  In addition, MetLife expected to release to beneficiaries around the country about $188 million in overdue death benefits in 2012, and that over the next 17 years it might distribute as much as $438 million in additional overdue death benefits.  The magnitude of the distributions made as part of the RSA ensured that the issues were raised to the Board level.

70.   On December 5, 2011, the New York State Department of Financial Services issued an Interim Report of the Superintendent pursuant to §308 of the New York Insurance Law.  The report confirmed that insurers, including MetLife, have retained monies for years that they knew or had reason to know should have been paid to beneficiaries on policyholders' deaths, some dating back to the 1970s:

**Interim Report of the Superintendent**
**Pursuant to Section 308 of the New York Insurance Law**
**Relating to Investigating Claims and Locating Beneficiaries**
**Owed Death Benefits**
**Under Life Insurance Policies, Annuity Contracts, and**
**Retained Asset Accounts**

December 5, 2011

*Summary*

LIFE INSURERS SHOULD REGULARLY MATCH life insurance policies against a reliable death list, rather than just waiting for claims to be filed.  The technology exists, and *it is clear that some insurers have been utilizing such death list databases in determining whether to curtail annuity payments.*  In response to the Department's investigation, life insurers that have undertaken the prescribed matching efforts have made $52.6

22

million in payments to almost 8,000 beneficiaries that would not have otherwise been made. About $16.9 million of that sum has been paid to New York payees. Moreover, matching done as a result of the Department's review has already produced another almost 28,000 matches for which claims processing has been initiated and located another almost one million initial matches that need further checking, but will likely result in substantial additional payments.

*Background*

THE DEPARTMENT OF FINANCIAL SERVICES (the "Department" or "DFS") has been conducting an inquiry into allegations of unfair claims and trade practices by authorized life insurers and fraternal benefit societies (collectively, "insurers") based on concerns that insurers may not be adopting and implementing proper standards for investigating claims and locating beneficiaries with respect to death benefits under life insurance policies, annuity contracts, and retained asset accounts. *In particular, there may be instances where a death has occurred and no claim has been filed, but premiums continue to be deducted from the account value or cash value until the policy lapses.* In some instances beneficiaries may be unaware that they have been named as a beneficiary and not realize that they need to file a claim. *In the context of retained asset accounts, funds may simply remain dormant after the death ....*

Recently, the Department issued a letter pursuant to Section 308 of the New York Insurance Law ("308 letter") advising all insurers that a cross-check of all life insurance policies, annuity contracts, and retained asset accounts on their administration data files, including group policies for which an insurer maintains detailed insured records, should be performed with the latest updated version of the U.S. Social Security Administration's Death Master File ("SSA-DMF") - or another database or service that is at least as comprehensive as the SSA-DMF - to identify any death benefit payments that may be due under life insurance policies, annuity contracts, or retained asset accounts as a result of the death of an insured or contract or account holder....

*Findings to Date*

BASED ON THE DEPARTMENT'S INVESTIGATION, including responses to the Department's 308 requests, *it appears that some insurers have utilized the SSA-DMF to stop annuity payments once a contract holder dies, but have not used the SSA-*

> *DMF to determine if any death benefit payments are due under life insurance policies, annuity contracts, or retained asset accounts.*

71.     The RSA between MetLife and the participating states details that in addition in exchange for the releases of claims, which could have been brought by the states, the Company agreed to wide-ranging corporate reforms, agreed to pay the states $40 million for the cost of their investigations and subject itself to enforcement action for failure to comply with the terms of the agreement.  The RSA, excerpted below, also memorialized certain of the findings leading to concerns about the Company's death benefit practices:

> WHEREAS, based upon the information gathered to date, the Departments have identified concerns regarding:
>
> A.     The adequacy of the Company's policies and procedures to ensure that life insurance and endowment policies, annuities, "Retained Asset Accounts" (hereafter defined) and other funds are either timely paid out to "Beneficiaries" (hereafter defined), or timely reported or remitted in accordance with the "Unclaimed Property Laws" and the "Insurance Laws" (hereafter defined);
>
> B.     The Company's historical use of the DMF to terminate payment under annuity contracts in the "payout" phase to annuitants who have died, but not attempt to locate Beneficiaries to payout the death benefit under annuity contracts or life policies issued by the Company;
>
> C.     The adequacy of the Company's policies and procedures to ensure that the financial benefits due under matured annuity contracts are paid to annuitants or reported and remitted in accordance with the Unclaimed Property Laws and the Insurance Laws;
>
> D.     The adequacy of the Company's policies and procedures to ensure that assets held in the Company's Retained Asset Accounts are paid to Beneficiaries or "Accountholders" (hereafter defined) or reported and remitted in accordance with the Unclaimed Property Laws, when the Accountholder is listed as deceased on the DMF, or, alternatively, the Accountholder has not initiated a financial or administrative action with respect to the Retained Asset Account for an extended period of time;

*      *      *

WHEREAS, in 2007, the Company matched substantially all of its individual life policies for which it had electronic records, including policies in in-force, terminated and non-forfeiture status against the DMF and identified over $50 million in death benefits, which were paid to Beneficiaries and over $30 million in unclaimed benefits which have been or will be reported and remitted to the appropriate   states in accordance with the Unclaimed Property Laws;

WHEREAS, in 2010, *subsequent* to the commencement of the Multi-State Examination, the Company established its Electronic Death Match ("EDM") initiative pursuant to which the Company committed to match its individual life and annuity, group life and annuity and retained asset accounts against the DMF no less frequently than annually and, *in 2011, in accordance with that initiative, as well as a request for a report by the New York Superintendent of Insurance pursuant to Section 308 of the New York Insurance Law, the Company performed matches of the administrative records for individual and group life, individual and group annuities and retained asset accounts of all of the MetLife affiliated companies for all fifty states, and the Company has to date identified approximately* $96 *million to be paid to Beneficiaries from these matches, and over* $16 *million to be paid to the states as unclaimed property;*

*      *      *

Business Reforms.  The Company agrees that within sixty (60) days from the Effective Date of this Agreement, the Company shall adopt the following policies and procedures:

a.      Perform comparisons, either directly or indirectly, of all of its in-force Insureds, Accountholders, Annuity Contract Owners, and annuitants, for which the Company provides Recordkeeping services, against the DMF, or an equivalent database containing the same information as the DMF, *on at least a monthly basis in accordance with the transition period set forth in Schedule B.*  The Company shall use the comparison criteria specified in Schedule A.  *In the event that the  Company uses different comparison  criteria than those specified in Schedule A, the Company may be subject to sanctions to the extent that it obtains five percent* (5%) *fewer valid matches than would* otherwise have been obtained using Schedule A.

b.       Subject to Schedule B, if the Company is not contacted by a Beneficiary within one hundred twenty (120) days of the Date of Death Notice, the Company shall promptly commence a Thorough Search, which shall be completed within one (1) year from the Date of Death Notice.  At the conclusion of that one (1) year period, if (i) the Beneficiary cannot be located by a Thorough Search and (ii) the Company is unable to establish an Exception, it shall report and remit the death benefit proceeds as Unclaimed Property to the affected state(s) in accordance with the applicable Unclaimed Property Laws ....

c.       *For the sole purpose of this Agreement, the Company, within the time period in Schedule B, shall implement policies and procedures establishing a DMF listing as prima facie proof of death and requiring* the Company to initiate its death claims process and conduct a Thorough Search for Beneficiaries in accordance with Section 2(b) of this Agreement....

d.       Utilize the DMF on all of its Life Insurance Policy, Annuity Contract, and Retained Asset Account product lines using the comparison methodologies ....

72.     In addition to the monetary payments related to unpaid *life insurance* benefits, MetLife agreed to the establishment of certain policies and procedures to ensure that *annuity* benefits would be paid:

Commencing no later than forty-five (45) days prior to the Maturity Date of an Annuity Contract[3] for which the Company is unable to establish an Exception, at least two (2) letters are sent to an Annuity Contract Owner notifying the owner of the upcoming Maturity Date, stating that the Contract will be annuitized following the Maturity Date if no response is received, and identifying any alternatives to annutization available under the Contract (e.g., extension of the Maturity Date; surrender of the Contract); [and]

---

[3]      In the context of this settlement agreement, Annuity Contracts are limited to those contracts designed to pay a death benefit–not ongoing benefits.

> The Company shall immediately commence a Thorough Search for
> the Annuity Contract Owner if the letters [described above] are
> returned as undeliverable.[4]

73.     The above-described investigation of unpaid death benefits and resulting settlement put MetLife on notice that it had systemic problems with the monitoring of beneficiaries, including of annuity contracts, and the timely payment of benefits to those so entitled.  The corporate reforms undertaken by MetLife pursuant to the settlement agreement also demonstrate that MetLife understood how to address this problem through business policies and procedures.  The fact that MetLife failed to use this knowledge and expertise to ensure proper beneficiary identification in its annuity RIS business shows Defendants' disregard for the integrity of its reported financial results.

### C.     MetLife's PTRTA "Location" And Reserves Issues

74.     The RSA required MetLife to use certified mail, electronic mail, the telephone, and online databases to contact annuitants.

75.     But the Company failed to use those obvious tools to conduct pension risk transfer annuitants because as directors knew MetLife specifically excluded pension risk transfer annuitants from being covered by the changes agreed to in the RSA.  Specifically, the RSA defined "Annuity Contract" as follows:

> "Annuity Contract" means a fixed or variable annuity contract
> *other than a fixed or variable annuity contract issued to fund an
> employment-based retirement plan where MetLife is not
> committed by the terms of the annuity contract to pay death
> benefits to the beneficiaries of specific plan participants.*  Nothing
> in this Agreement shall be construed as an admission of any
> party's position as to the preemptive effect of the Employee

---

[4]     2012 Regulatory Settlement Agreement Between MetLife and Various State Insurance Departments,                                                                       §§2(t)(i-ii), https://insurancc.mo.gov/CompanyAgentSearch/search/documents/MetLifeSettlementAgreement .pdf.

Retirement Income Security Act of 1974, as periodically amended,
on state laws as applied to employment based plans.

76.    The Company was significantly enhancing its location practices for most
annuitants, but its directors purposely and knowingly failed to do the same for pension risk
transfer annuitants. Instead, they let MetLife continue on its practice for risk transfer annuitants
the very same two letter practice that the RSA was designed to remediate.

77.    By agreeing to enhance the Company's policies for contacting annuitants, but
specifically excluding pension risk transfer annuitants, Defendants knew, or were reckless in not
knowing, that the Company's practice for locating pension risk transfer annuitants was improper
at all relevant times. Defendants' conduct is especially egregious because, unlike pension risk
transfer annuitants who may not know that MetLife is responsible for paying them, the
annuitants covered by the 2012 Settlement Agreement were not susceptible to such confusion
because they had entered into annuities directly with MetLife.

78.    Further, in connection with the Multi-State Investigation, Todd Katz ("Katz,"
MetLife's Executive Vice President for Group Benefits, testified on May 19, 2011, before
commissioner McCarty, and admitted that MetLife routinely used the SSA-DMF each month to
identify decreased group annuitants so that the Company could stop making payments to these
people. This means that, at all relevant times, MetLife was using the SSA-DMF to ascertain
whether pension risk transfer annuitants had died so that they could stop paying benefits, but was
not using the SSA-DMF to ensure that those annuitants who were presumed dead were actually
deceased. Specifically, Katz testified, other things, as follows:

> **Commissioner McCarty**: Okay. The we'll explore that with the
> different products. That would probably be great. ***Does MetLife
> use the Social Security Death Master File information for group
> annuities***?

**Mr. Katz:**  *We do*.  And I probably should talk a little bit about why we do and how that works, if that would be okay.  For group annuity business, group annuities are typically claims that for the most part are in pay-off status; and so in a similar reason for using it as Social Security Administration has indicated, *we use it as a means to prevent duration errors*.  If you thing about the death – the annuity business almost getting a regular check each month, *and if we receive an indication of death, that an individual has an annuity, we will suspend that payment and write to the family to assure that the death occurred*.  And I should clarify that.  The rationale for that is if we didn't and continued with payments, by definition, if we were making payments to people who were dead, those would be duration errors, they would be inappropriate payments, and they also could put the beneficiary in a bad spot because they are getting money that actually isn't theirs.

**Commissioner McCarty**:  Right.  Understood.  Without – I understand that's a large corporation and as you already specified.  And just in general, how long has MetLife sued the Death Master for group annuities?

**Mr. Katz**:  To the best of my knowledge, *we have been using it since the late '80s*.

**Commissioner McCarty**:  Okay.

**Mr. Katz**:  I can't give you an exact year.

**Commissioner McCarty**:  That's fine.  Does MetLife have written policies and procedures as it relates to the use of the Death Master File for group annuities?

**Mr. Katz**:  I believe we do, *yes*.

\*        \*        \*

**Commissioner McCarty**:  What is the match-up rate timeline [for the Death Master File] for today?

**Mr. Katz**:  Currently, for group annuities, *we are matching once a month*.

**Commissioner McCarty**:  Once a month.  Okay.  What do you do when you get a match?  I presume you would stop making the annuity payment.

> **Mr. Katz:**  *For a group annuity, we consider a match an indication of death.  We suspend the annuity payment.  We write to the family indicating that we have done that.*

79.     MetLife not only had access to the SSA-DMF, but was actively using it since the 1980s to ensure that MetLife was not paying PTRAs, after they died.  MetLife, which had written policies and procedures for this practice, conducted these SSA-DMF match searches once a month but *never* used the SSA-DMF to confirm that missing PTRAs – had actually passed away.  In other words, the Company could have easily used the SSA-DMF to confirm that PTRAs were actually decreased after receiving no response to the two form letters, but consciously and recklessly chose not to do this.  Instead, the Company only used the SSA-DMF when it benefitted MetLife's interests.

80.     Despite clear requirements, between 13,500 and 30,000 retirees covered under MetLife annuities were never notified that they were eligible for benefits and MetLife took their annuity benefits, converting more than $500 million of these owed benefits to earnings and revenues.  MetLife has admitted that it only engaged in half-hearted attempts to contact these Annuitants by sending letters only once at age 65 and again at age 70½.

81.     If annuity benefits went unclaimed by age 70½, MetLife's annuity payment system automatically presumed the Annuitant dead without ever checking public death files, as it was required to do under its consent decree with regulators.  That is, the annuity database was programmed to <u>assume</u> death at age 70½ if the annuity had not been claimed.  Further, upon presuming the death of the Annuitant, MetLife made no attempt to contact designated beneficiaries of the annuitant.  And MetLife did not escheat the unclaimed annuity benefits as required under state law unclaimed property statutes.

82.     For each beneficiary, a specific sum of money is paid by an employer to MetLife to cover annuity payments to the given beneficiary.   The specific sum of money paid by employers to MetLife to cover annuity payments to beneficiaries constitutes the bare minimum group annuity reserve at the time of the payment, and reserve liability would grow as the obligation continues.   The group annuity reserves are the monies owed to beneficiaries by MetLife.   By "releasing" reserves to itself and treating the monies as income, MetLife took monies belonging to beneficiaries for its own use and profit.   Having converted those liabilities to income, MetLife caused its sworn annual financial statements to be false.   Those inflated financial results impacted both risk-based capital ("RBC") and reported surplus.   These are results that must be factored in the determination of whether or not stockholder dividends are "reasonable incentives."

**D.     Additional Red Flags That Were Ignored By Defendants**

83.     MetLife conducted a "complete internal audit" of the Company's annuity business in or about 1996.   This complete audit included annuities.   This audit should have detected systemic problems with the payment of annuity benefits-putting MetLife of notice that thousands of workers were in danger of not receiving the benefits they earned and that were paid for by their former employers.

84.     In addition, the estate of a former Martindale-Hubbell employee who retired in 1994 brought a FINRA arbitration proceeding against MetLife in January 2016[5] for non-payment of benefits pursuant to a GAC.[6]   According to the FINRA Statement of Claims, William P.

---

[5]     FINRA Dispute Resolution No. 15-03033; *Estate of William P. Toland, Sr. vs. Metropolitan Life Insurance Company and Reed Elsevier, Inc.*

[6]     On August 3, 2016, Met Life enjoined the FINRA arbitration arguing, among other things, that the dispute was not subject to mandatory arbitration pursuant to FINRA rules and that the matter should be tried in the United States District Court for the District of

Toland, Sr. ("Toland") was the beneficiary of GAC 451 though his former employment with Martindale-Hubbell. After working for Martindale-Hubbell for 34 years, Toland retired in February 1994. Under the terms of the annuity, his benefits were to commence at the latest by 1990 when Toland turned 85. Toland was unaware that he was a beneficiary and was first notified by MetLife that he was eligible for such benefits in September 2012-18 *years after his retirement.* Sadly, Toland passed away in March of 2013 and never received the annuity benefits he was due, with the claim for such benefits passing to his estate.

85.     MetLife's excuse for its failure to pay annuity benefits to Toland was that it did not have a current address at which it could contact him before 2012 - despite the fact the he and his family had lived at the same home for over 48 years and he was still receiving certain other retirement benefits to which he was entitled through his employment with Martindale-Hubbell.

86.     According to *The Wall Street Journal*, beginning in 2013, the Department of Justice ("DOJ") office in Philadelphia began receiving questions from pensioners wondering why they were not receiving their pension benefits. By 2015, the DOJ's Philadelphia office opened an investigation into the matter.

87.     In response to the DOJ's investigation, MetLife launched an internal pilot program in August 2016 to address this issue, which was never disclosed to investors during the Class Period (the "Pilot Program"). The Pilot Program involved using additional data sources to locate missing pension risk transfer annuitants beyond the Company's standard practice of sending two form letters and then presuming death when there was no response. At all relevant times that the Pilot Program was underway at MetLife, the Company continued to improperly

Massachusetts. *See Metropolitan Life Ins. Co.* v. *Michelle Smith, Executrix of the Estate of William P. Toland Sr.,* No. 1:16-cv-115 82 (D. Mass. 2016). The Court agreed with MetLife and the matter proceeded in the District Court, eventually settling in December 2017 for an undisclosed amount.

release reserves that had been for pension risk transfer annuitants because these annuitants were being presumed as dead after not responding to the two form letters, five years apart.  The Pilot Program further establishes that Defendants knew, or were reckless in not knowing, that the Company's practice for locating pension risk transfer annuitants was improper at all relevant times.

88.     The incident with Toland alerted MetLife as of January 2016 that the Company was undergoing a systemic failure with the payment of benefits to GAC beneficiaries and underscored the human cost of this failure.  Yet, according to MetLife's December 15, 2017 disclosure that at least 30,000 beneficiaries had not received annuity benefits (discussed *supra),* the Company only "recently" initiated an "ongoing global review of its processes and procedures for identifying unresponsive and missing policyholders and beneficiaries for the other insurance and annuity products it offers."

### E.      MetLife's Manipulation of Annuity Reserves is Publicly Revealed

89.     Also, on December 15, 2017, the Company filed a Form 8-K with the SEC in which it announced that it had not been able to locate some of the Company's annuitant population and planned to provide an update upon the filing of its next Form 10-K for the year ending December 31, 2017, stating in relevant part:

> Further, MetLife has been in the retirement business for many decades.  As practices have evolved, we are improving the process used to locate a small subset of our total group annuitant population of approximately 600,000 that have moved jobs, relocated, or otherwise can no longer be reached via the information provided for them.  We currently believe the portion of the subset that is most impacted is less than 5% of our total group annuitant population and they tend to be smaller size cases with average benefits of less than $150 per month.
>
> We are making our process more robust to include a wider set of search techniques and better utilize available technology.  Taking

these actions would result in strengthening reserves, which in the period recorded may be material to our results of operations and is not reflected in the outlook presented herein.  We do not have an estimate at this point but we plan to provide further disclosure on our fourth quarter earnings call and in our annual report on Form 10-K for the year ended December 31, 2017.

90.     On December 15, 2017, *The Wall Street Journal* published the article, "MetLife Discloses Failure to Pay Thousands of Workers' Pensions," which discussed how MetLife failed to pay month pension benefits and how long this wrongdoing was occurring, stating in relevant part:

MetLife Inc. said it had failed to pay monthly pension benefits to possibly tens of thousands of workers in accounts that it has on its books as part of its large retirement business.

*The New York insurer said it is seeking to find the retirees who are owed money and who generally have average benefits of less than $150 a month.  It said it believes the group represents less than 5% of about 600,000 people who receive certain benefits from the firm.*

The discovery of the overdue money and the process of locating the missing people to pay them would require strengthening reserves, MetLife said in a filing.  The company also said the amount "may be material to our results of operations."

The workers affected by Friday's disclosure were likely owed a defined amount of monthly income when MetLife took on responsibility for the pensions from their employers, under a booming business known as pension risk transfer.  MetLife didn't say in what years it had acquired these particular pension plans, how many different plans the people were involved in, and how many years of missing income was owed.

*Some Wall Street analysts assumed that the payments could be 10 or more years overdue.  At $150 a month for 30,000 people-5% of the 600,000-over 10 years, that could be up to $540 million.*

(Emphasis added.)

91.     On January 29, 2018, MetLife issued a press release entitled, "MetLife Preannounces Preliminary Fourth Quarter 2017 Earnings, Reschedules Earnings Release and

Conference Call," which announced that MetLife had to reschedule the earnings releases and conferences calls the fourth quarter 2017 and the full year 2017, that the Company identified material weaknesses in its internal controls, that the Company would have to make revisions to prior financial statements, and that the SEC and New York Department of Financial Services had made inquiries to the Company, stating in relevant part:

> NEW YORK--(BUSINESS WIRE)--Jan. 29, 2018-- MetLife, Inc. (NYSE:MET) today announced it has postponed its earnings report and conference call related to its results for the fourth quarter and full year ended Dec. 31, 2017, which had previously been scheduled for Jan. 31, 2018, and Feb. 1, 2018, respectively. MetLife will now issue its fourth quarter and full year 2017 earnings report and its Fourth Quarter Financial Supplement on Tuesday, Feb. 13, 2018 after the market closes.  The company will hold its earnings conference call and audio webcast on Wednesday, Feb. 14, 2018 from 8:00 to 9:00 a.m. (EST).  MetLife expects to file its 2017 Form 10-K by March 1, 2018.

> On its Dec. 15, 2017, Investor Outlook Call, MetLife announced that it was undertaking a review of practices and procedures used to estimate its reserves related to certain Retirement and Income Solutions group annuitants who have been unresponsive or missing over time.

> *Management of the company has determined the prior release of group annuity reserves resulted from a material weakness in internal control over financial reporting.*  MetLife expects to increase reserves in total between $525 million and $575 million pre-tax, to adjust for reserves previously released, as well as accrued interest and other related liabilities.  The amount of the reserve increase is based in substantial part on actuarial, legal, statistical, and other assumptions.  If actual facts and factors differ from those the company has assumed, the reserve the company has established could be adversely or positively affected.

> The total amount expected to impact fourth quarter 2017 net income is between $135 million and $165 million pre-tax, the majority of which represents a current period strengthening of reserves and will be reflected in Adjusted Earnings (formerly known as Operating Earnings)*.  We *expect the full year 2017 net income impact to be between* $165 *million and* $195 *million pre-tax.  In addition, the company intends to make prior period*

*revisions to reflect the balance of these adjustments in the appropriate historical periods. The company also expects to correct historical periods for unrelated errors in those periods, as required by accounting standards. Those errors were previously recorded in the periods in which the company identified them.*

Revisions to prior periods will be included in MetLife's 2017 Form 10-K and Fourth Quarter Financial Supplement. These revisions will not constitute a restatement of previously issued financial statements. These pre-tax revisions will be taxed at the 35% U.S. tax rate in effect, and the impacts of the recently enacted U.S. tax reform legislation will be reflected in Corporate & Other in the fourth quarter of 2017.

In connection with MetLife's review and enhancement of the processes and procedures relating to its Retirement and Income Solutions business in the United States, MetLife is currently reviewing its processes and procedures for identifying unresponsive and missing international group annuity annuitants and pension beneficiaries. In addition, MetLife recently initiated an ongoing global review of its processes and procedures for identifying unresponsive and missing policyholders and beneficiaries for the other insurance and annuity products it offers. MetLife is not currently aware of any material deficiencies in its identification of unresponsive or missing annuitants, policyholders or beneficiaries with respect to such products under review.

*MetLife had previously informed its primary state regulator, the New York Department of Financial Services, about this matter and is responding to questions from them and other state regulators. The U.S. Securities and Exchange Commission enforcement staff has also made an inquiry regarding this matter and MetLife is responding to its questions. To date, MetLife is not aware of any intentional wrongdoing in connection with this matter.*

(Emphasis added.)

92.     MetLife also postponed its fourth-quarter earnings report, saying it would revise prior financial reports.

93.     MetLife's "releasing reserves" for unpaid (but owed) benefits amounted to a material weakness in MetLife's administration of the annuities, as expressed in a slide presentation during MetLife's 2017 fourth quarter earnings call:[7]

### INITIAL STEPS TO REMEDIATE MATERIAL WEAKNESS

- **Administrative practices not sufficient to allow for reserves to be released**

  - Correct practices of releasing reserves to ensure improvements made

  - Improve communications with annuitants regarding benefits

  - Establish more frequent attempts to contact annuitants and utilize additional commercial locator services

- **Lack of timely escalation throughout the Company**

  - Reviewing escalation practices

  - Will hire third party advisors to conduct comprehensive examination led by Chief Risk Officer

94.     Due in part to maintaining funds that properly belong to policyholders' beneficiaries or state unclaimed property funds, the Company reported strong revenue and income and operating earnings as a result of the Company's purportedly strong underwriting and investing activities, while failing to disclose that reported income was materially overstated due to the Company's failure to account and reserve for known liabilities associated with policyholders.

95.     MetLife's administration of annuity retirement benefits suffers from deep and systematic flaws.  But these flaws are features not bugs.  That is, MetLife's administration of annuity benefits is designed to fail so that MetLife can delay payments, convert annuity benefits

---

[7]      *See* MetLife Form 8-K, filed February 13, 2018.

for its own use, and profit therefrom.  MetLife admitted to converting over $500 million in annuity benefits from reserves held to pay those benefits to assets on its own balance sheet.  It made little or no effort to locate Annuitants or their designated Beneficiaries.  And even when it paid annuity benefits it failed to pay interest on back-benefits owed, as is the case with Plaintiff here.

96.     The scope and scale of MetLife's failures are particularly egregious considering that it comes on the heels of MetLife's failure to pay death benefits in connection with the Company's *life insurance* business.  That resulted in the Company paying $500 million in overdue death benefits-and a requirement under the terms of the RSA to look for similar problems in its annuity business.  That MetLife then allowed five years to pass before acknowledging conversion of over $500 million in *annuity* benefits displays a shocking disregard for its obligations under regulatory decrees and settlements.

97.     MetLife has now confirmed that over the course of 25 years, it failed to keep track of Beneficiaries, failed to contact them, and failed to pay them their benefits when due.  Later, when it was required to escheat the funds to states under unclaimed property laws, the Company retained the money for itself.  MetLife has acknowledged that it owes as many as 30,000 beneficiaries more than $500 million in annuity benefits.  In admitting that it failed to provide these annuity benefits, MetLife provided additional detail about its policies and procedures concerning the payment of annuity benefits-which apparently involved nothing more than sending two letters, one when the beneficiary turned 65 and one at age 70½.

98.     Throughout the 25 years of non-payment of annuity benefits, MetLife has had an ongoing obligation to review its products and processes, but in January 2018, the Company announced that it only "recently" initiated an "ongoing global review of its processes and

procedures for identifying unresponsive and missing policyholders and beneficiaries for the other insurance and annuity products it offers"[8] and is still undertaking a process to hire "advisors to conduct a comprehensive analysis."[9]

99.     Industry analysts and consumer advocates alike were stunned on December 15, 2017 when MetLife announced that it's much touted GAC retirement products had failed to pay annuity benefits to as many as 30,000 retirees.  As a result of this colossal failure, the Company further announced that:

> The prior release of group annuity reserves resulted from a material weakness in internal control over financial reporting. MetLife expects to increase reserves in total between $525 million and $575 million pre-tax, to adjust for reserves previously released, as well as accrued interest and other related liabilities. The amount of the reserve increase is based in substantial part on actuarial, legal, statistical, and other assumptions.[10]

100.     MetLife blamed its failure to pay annuity benefits on its inability to locate "unresponsive and missing international group annuity annuitants and pension beneficiaries" – suggesting that MetLife has been aware of the problem for some time.  Wall Street analysts assumed that the affected payments could be ten years or more overdue.[11]

---

[8]     RTT News, "MetLife Discloses Accounting Issue, Postpones Earnings Release, Stock Down," *Marketslnsider* (Jan. 29, 2018), at http://markets.businessinsider.com/news/stocks/MetLife-Discloses-Accounting-Issue-Postpones-Earnings-Release-Stock-Down-1014496109.

[9]     MetLife Q4 2017 Earnings Call Transcript, held on February 14, 2018.

[10]     MetLife Press Release filed on Form 8-K on January 30, 2018.

[11]     http://online.wsj.com/public/resources/documents/print/WSJ_-B001-20171216.pdf.

101.    MetLife further announced that it only "recently" initiated an "ongoing global review of its processes and procedures for identifying unresponsive and missing policyholders and beneficiaries for the other insurance and annuity products it offers."[12]

102.    Indeed, MetLife has acknowledged that it failed to have the processes in place to ensure payment of annuity benefits:

> When we realized this was a significant issue, we launched an effort to do three things:  figure out what happened, strengthen our processes so that we do a better job locating retirees, and promptly pay anyone we find – as we always do ....  We are deeply disappointed that we fell short of our own high standards.  Our customers deserve better.[13]

103.    MetLife's belated review of its processes, failure to have appropriate processes in place, acknowledgement that its internal controls were deficient, and ultimate admission that it failed to pay benefits to as many as 30,000 retirees demonstrates an egregious breach of trust.

104.    To downplay the seriousness of the problem, MetLife noted that the owed benefits would be generally less than $150 per month.

105.    Then, on February 14, 2018, Kandarian shed further light on the scope of the Company's failure during its fourth quarter 2017 conference call, which he opened with a public apology:

> Simply put, this is not our finest hour.  We had an operational failure that never should have happened, and it is deeply embarrassing.  We are undertaking a thorough review of our practices, processes and people to understand where we fell short

---

[12]    "MetLife Discloses Accounting Issues, Postpones Earnings Release, Stock Down," *Markets Insider* (Jan. 29, 2018, at http://markets.businessinsider.com/news/stocks/MetLife-Discloses-Accounting-Issue-Postpones-Earnings-Release -Stock-Down-1014496109.

[13]    Kozlowski, Rob, "MetLife Discloses It Failed to Pay Benefits to Some Retirees from Annuity Buyout," *Pensions & Investments* (Dec. 18, 2017), at http://www.pionline.com/article/20171218/ONLINE/171219824/metlife-discloses-it-failed-to-pay-benefits-to-some-retirees-from-annuity-buyouts.

and how we can reset the bar at the high-level people have come to
expect from us over our 150-year history.[14]

106.    Kandarian revealed that MetLife's systemic failure to pay retirement benefits to the GAC Beneficiaries has been going on for approximately 25 *years.*   Moreover, MetLife agreed in 2012, in connection with the RSA, which resulted from the similar non-payment of life insurance benefits, to adopt policies and procedures to ensure prompt and accurate payment of annuity benefits.   Notwithstanding MetLife's promise in this regard, it failed to pay more than $500 million in owed pension annuity benefits.

107.    In addition, Kandarian disclosed MetLife's lack of diligence in paying these retirement benefits, revealing that the entire process involved only two attempts to contact the beneficiary–once at age 65 and once at age 70½ at their last known address.[15]   Kandarian mentioned no follow-up effort to locate those Annuitants and Beneficiaries who may have changed their addresses.   Instead, MetLife shrugged its shoulders and kept those funds for itself. Ultimately, MetLife released the reserves for those annuitants – essentially treating their unpaid retirement benefit as income-profiting (as well as inflating RBC and reported surplus) based on the Company's own lack of diligence-or worse, calculated misfeasance-in administering the GACs.[16]

108.    This core fact - that MetLife released annuity reserves and treated the money as income-demonstrates a palpable disregard for the retirement needs of annuitants and beneficiaries.   Not only did MetLife fail to pay annuity benefits to annuitants and beneficiaries, it

---

[14]    MetLife Q4 2017 Earnings Call Transcript, held on February 14, 2018.

[15]    *Id.*

[16]    MetLife also failed to reserve for interest, tax penalty payments, and other funds that would be due to the unpaid beneficiaries.

took their annuity benefits for itself, and even when it did pay benefits years after they were due, MetLife did not pay interest on the back benefits owed.

109.    By taking this money for itself, and not making required distributions to Beneficiaries, MetLife also may have subjected the Beneficiaries to IRS penalties and other payments that they otherwise would not have paid.

110.    One industry analyst called this announcement a "major black eye" for MetLife.[17]

111.    Maria Vullo, Superintendent of the New York Department of Financial Services, commented on the debacle by underscoring MetLife's failure to adapt its protocols for paying claims in the modern era of worker mobility:  "What used to be standard protocol for finding retirees who are owed benefits is no longer sufficient."[18]

112.    William Galvin, the Massachusetts Secretary of State, similarly launched an investigation in December 2017.  However, unlike MetLife, Massachusetts was quickly able to identify correct addresses for a majority of the unpaid Beneficiaries in Massachusetts.  As of March 1, 2018, Massachusetts had already sent letters to those members of the Class and had determined that the average age of the "missing" Beneficiaries in Massachusetts is 72.

113.    MetLife has disclosed that it has received, and is responding to, inquiries from its lead state regulator in New York and other state regulators.  The Company has also disclosed that the Securities and Exchange Commission enforcement staff "has made an inquiry" about the matter.[19]

---

[17]    Leslie Scism, "MetLife Says Pension Shortfall Will Prompt Financial Revisions," *The Wall Street Journal* (Jan. 29, 2018), at https://www.wsj.com/articles/metlife-says-overdue-pension-benefits-will-prompt-financial-revisions-1517262947.

[18]    "NY, Mass. Investigate MetLife over Unpaid Pensions," *Chief Investment Officer* (Dec. 20, 2017), at https://www.ai-cio.com/news/ny-mass-investigate-metlife-unpaid-pensions/.

[19]    https://www.wsj.com/articles/metlife-says-overdue-pension-benefits-will-prompt-financial-revisions-1517262947.

114.    Repercussions from MetLife's malfeasance in handling pension benefits continue to reverberate through the Company.  On May 1, 2018, MetLife announced that Hele, its Chief Financial Officer ("CFO"), had been replaced with immediate effect.  The CFO's departure came less than a week after MetLife disclosed that it had cut Heles pay, citing "[poor] performance in managing financial matters, including material weaknesses in internal control over financial reporting."[20]

## V.

## DEMAND FUTILITY ALLEGATIONS

115.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as though they were fully set forth herein.

116.    Plaintiffs bring this action derivatively in the right and for the benefit of MetLife to redress the breaches of fiduciary duty and other violations of law by Defendants.

117.    The Board, at the time this litigation commenced (and therefor the Board subject to any demand analysis), consisted of the following directors:  Kandarian, Greise, Guitierrez, Hassell, Herzog, Hubbard, Kelly III, Kennard, Kilts, Kinney, McKenzie and Morrison.  Half of the Board (6 out of 12 members) were members of the MetLife Board at the time of the 2012 Settlement or shortly thereafter as compliance procedures were supposed to have been implemented:  Kandarian, Grise, Kinney, Hubbard, Gutierrez and Kilts.  As a result, there is no majority of directors who were not directors at the time of the 2012 Settlement and/or its immediate implementation period thereafter.  Plaintiffs did not make a demand on the Board prior to initiating this action because such a demand would have been a futile, wasteful and useless act because a majority of the Directors Defendants would have been "interested" in (and

---

[20]    Gray, Alistair, "MetLife Finance Chief Leaves After Reserves Debacle," *Financial Times* (May 1, 2018), https://www.ft.com/content/34ea5c44-4d4f-11e8-97e4-13afc22d86d4.

therefore conflicted from and unable to fairly consider) a demand because they face a substantial

likelihood of liability for their role in MetLife's improper misconduct and for the additional

reasons set forth below.

118.    Plaintiffs will adequately and fairly represent the interest of MetLife and its

shareholders in enforcing and prosecuting this type of action.

119.    Demand futility requires the presence of a disinterested majority of directors for

purposes of considering a stockholder demand.  Here, at least ten of MetLife's twelve Directors

lack independence and/or disinterestedness which render them incapable of objectively

considering whether a stockholder demand is in MetLife's best interests.

**A.    Demand Is Excused Because Each Of The Individual
        Defendants Faces A Substantial Likelihood Of Liability
        In Pending Securities Class Actions Or This Action**

**1.    Five Of MetLife's Current Directors Are Defendants In
        Securities Act Class Action Lawsuits Alleging Similar
        Illegal Conduct To That Alleged Here**

120.    Five of MetLife's current directors, Grise, Kilts, Hubbard, Kandarian and Kinney

are Defendants in the 2012 Litigation (previously identified herein), which is currently pending

before the Honorable Lewis A. Kaplan in the United States District Court of the Southern

District of New York.

121.    Specifically, the 2012 Litigation involves a class of investors alleging Securities

Act claims against MetLife, the five directors identified above and certain officers for a certified

class period of February 2, 2011 to October 6, 2011.  Among other things, the 2012 Litigation

alleges that the MetLife registration statements signed by the five directors identified above were

defective and issued in violation of Sections 11 and 12(a)(2) of the Securities Act.  The

Securities Act class in the 2012 Litigation was certified by Judge Kaplan on September 22, 2017 against, *inter alia*, the five directors identified above.

122.   The 2012 Litigation is based upon the concealment and misrepresentations concerning MetLife's accounting reserve and release policies and false and misleading financial statements arising out of MetLife's shoddy and illegal beneficiary location and escheatment practices.  The practices at issue in the 2012 Litigation (and Defendants' liability) are essentially the same practices at issue herein.  Defendants Grise, Kilts, Hubbard, Kandarian and Kinney cannot objectively consider a demand with respect to the actions herein in addition to the reasons set forth at Subsection A.2 and B and C of this section, because the possibility of their personal financial exposure in the 2012 Litigation represents an irreconcilable conflict between their best personal interests and the best interests of MetLife.

### 2.   Demand Is Excused Because A Majority Of The Current Board Members Are Conflicted By A Substantial Likelihood Of Liability Arising From Their Breaches Of Loyalty

123.   The board committees with specific responsibility for active involvement in the areas implicated by the 2017 regulatory actions concerning MetLife's pension risk transfer balances are the Audit Committee and the Finance and Risk Committee.

124.   The current directors on these committees make up a majority of the Board and face a substantial likelihood of liability.

125.   A majority of MetLife's current board cannot independently and disinterestedly consider a stockholder demand concerning the issues which are the subject of this suit because they are either:  (i) have been on the Board since 2013 and were directly responsible for ensuring that the failures in MetLife's systems required to be remediated as part of the RSA were also remediated with respect to MetLife's pension risk transfer business and PTRAs; and/or (ii)

members of the MetLife's Audit Committee and Finance of Risk Committee which were directly responsible for remediation of systems as above in (i). Further, each of the Current Director Defendants is potentially liable for actively concealing and withholding material information from stockholders and regulators, also in breach of their fiduciary duties.

### B.   Demand Is Excused Because The Director Defendants' Conduct Is Not A Valid Exercise Of Business Judgment

126.   The Director Defendants' challenged misconduct at the heart of this case is their refusal to extend the beneficiary identification practices imposed upon MetLife in the 2012 Settlement to the pension risk transfer business, including knowingly and consciously presiding over the Company's systematic understating of reserves and overstatement of income. In essence, as the "ultimate decision-making body" of the Company, the Board implemented, and condoned a business strategy based on deliberate, widespread, and deliberate violations of regulatory directives arising out of the 2012 settlement.

127.   Significantly, MetLife's unique history of non-compliance with the standards demanded by state regulators in the 2012 Settlement render the basis of this derivative action distinct from the case of virtually every other corporate board in the United States. A typical corporate board might plausibly claim ignorance concerning compliance failures in general. In this case, the MetLife Board was made specifically and uniquely accountable and responsible under the 2012 Settlement Agreement for monitoring, ensuring, and enforcing the Company's compliance with the 2012 Settlement. Further, as discussed below, a majority of the current members of the Board have served as directors since 2013, (Kandarian, Grise, Guittierez, Hubbard, Kennard, Kinney and Kilts) the outset of the 2012 Settlement and were, therefore, explicitly obligated to carry out these specific responsibilities. Their decision not to extend those practices to the pension risk transfer business do so, and to instead knowingly cause MetLife to

eschew compliance with these standards as an intentional business strategy, cannot be regarded as a valid exercise of business judgment.

128.     Moreover, this action does not arise from an anomalous incident of misconduct within the Company or from the acts of a rogue employee or division within the Company. Rather, serious compliance deviations occurred systematically and at every level of the Company as a direct result of the Board's decision to embrace and tolerate a policy of calculated deviation from standards as the Company's deliberate business strategy.  There is no legitimate "business judgment" involved in devising or carrying out such an unlawful policy.  Accordingly, demand on the Board is futile and excused.

### C.     Director Defendants' Decision Not To Take Any Action To Hold Any Officers Or Directors Accountable For The Harm To MetLife Arising Out Of The 2012 Settlement Or The 2017 Regulatory Actions Also Demonstrates The Futility Of Demand

129.     Demand is demonstrably futile because of the current board's lack of any action to investigate the conduct alleged herein or to ascertain whether it is in the best interests of MetLife to asset claims on behalf of MetLife against any former or current directors and officers. Despite receiving over half dozen stockholders demands upon the board to inspect boxes of records and/or take action to recoup losses to MetLife, there has been no announcement by MetLife of the appointment of a group of independent directors or a Special Committee in response thereto.

130.     Furthermore, there has been no announcement by MetLife of any recoupment from any "Executive Officer" or "Employee" of MetLife or any subsidiary thereof under the "MetLife Performance-Based Compensation Recoupment Policy."

131.     The Compensation Committee Defendants' deliberate decision not to pursue executive officer compensation recoupment in accordance with MetLife policy against the

Officer Defendants herein cannot be regarded as a valid exercise business judgment because there is no indication that MetLife's Compensation Committee even analyzed, studied or deliberated upon compensation recoupment.   Only board <u>decisions</u> are protected under the business judgment rule.  Failures to consider, deliberate and act are not

132.    For these reasons, each Defendant faces a substantial likelihood of liability for their participating in the illicit acts.  The sustained failure of the Board to ensure effective corporate governance and ensure compliance with the law can only have been a result of the Defendants' knowing breach or reckless disregard for their fiduciary duties.  Despite being aware of the Company's prior misconduct concerning pensions, the Defendants took not steps in an effort to prevent or remedy the situation, and that failure to take any action resulted in substantial corporate losses.  For these reasons, the Defendants' decision to not act was not made in good faith and was contrary to the best interests of the Company.

133.    All the Defendants were responsible for a sustained or systemic failure of the Board to exercise oversight.  Moreover, the 220 Production shows that they devoted patently inadequate time or consciously disregarded the pension risk transfer business issues compliance in particular.

134.    Defendants' conduct in violation of, among other things, these Defendants' fiduciary duties of good faith and loyalty, as well as MetLife's own Codes of Conduct and Corporate Governance Guidelines.  Thus, Defendants (a majority of the Board) each fact a substantial likelihood of personal liability for their acts in connection with these actions, rendering a demand upon them futile.

## VI.

## <u>FALSE AND MISLEADING STATEMENTS</u>

A.    **Annual Reports Signed By Director Defendants**

135.    In 2013, 2014, 2015, 2016 and 2017 ("Relevant Period") for Counts One and Two)the Director Defendants signed one or more of MetLife's Annual Reports on Form 10-K for the annual period ended December 31st.  Each of those annual reports contained materially false and misleading financial statements due to the overstatement of earnings and understatement of reserves for pension risk transfer annuitants who MetLife erroneously categorized as deceased. The same annual reports contained materially false and misleading statements at Item 9A Controls and Procedures that "The Chief Executive Officer and Chief Financial Officer have conclude that these disclosure controls and procedures are effective" and at "Management's Annual Report on Interval Control Over Financial Reporting" that "in the opinion of management, MetLife, Inc. maintained effective control over financial reporting at December 31st.

B.    **Certifications By Defendants Kandarian And Hele**

136.    In each of MetLife's annual reports on 10-K from 2012 to 2017, Defendants Kandarian and Hele falsely attested in certifications pursuant to Sarbanes Oxley Act of 2002 ("SOX") that MetLife's financial reporting was "accurate" and that there were no internal control issues nor any fraud which required disclosure.

137.    The statements made by Kandarian and Hele were materially false and misleading because MetLife financial reports and reported results were materially understating reserves and overstating earning due to MetLife's erroneous categorization of tens of thousands of pension risk transfer annuitants as decreased.

C.    **Annual Proxy Statement For Election Of Directors And Approval Of Compensation Plans And Awards**

138.    From 2013 through 2017, MetLife filed definitive proxy statements on Form DEF

14A, which were approved by all board members included proposals for election of directors and approval of annual compensation and compensation plans. In each of the Proxy Statements, MetLife stated that management had "updated its internal control documentation for changes in internal control and completed its testing and evaluation of MetLife's system of internal control over financial reporting in response to the requirements set forth in Section 404 of the Sarbanes Oxley Act of 2002 and related regulation."

## COUNT ONE

### Against Individual Defendants for Violations of Section 14(a) of the Exchange Act

139.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

140.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

141.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78I of this title."

142.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. §240.14a-9.

143.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2014-2018 Proxy Statements as set forth in Section VI, C were materially false and misleading.  The misrepresentations and omissions were  material to Plaintiff in voting on the matters set forth for stockholder determination in the 2014-2018 Proxy Statements, including but not limited to, election of directors, approval of executive compensation, and ratification of an independent auditor.

144.    The Company was damaged as a result of the Individual Defendants material misrepresentations and omissions in the 2014-2018 Proxy Statements.

## COUNT TWO

### Against Individual Defendants for Violations of
### Section 10(b) of the Exchange Act and Rule 10b-5

145.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

146.    During the relevant period, the Director Defendants signed and/or disseminated and/or approved annual reports on Form 10K and annual proxy statements that failed to disclose (a) that MetLife's practices and procedures used to estimate its reserves set aside for annuity and pension payments were inadequate;  (b) that MetLife had inadequate internal controls over financial reporting; and (c) that as a result, the Company's reserves were inaccurate, insufficient,

and misstated. Thus, the price of the Company's shares was artificially inflated due to the deception of the Director Defendants.

147.    As such the Director Defendants caused the Company to violate Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud; and

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

148.    The specific misstatements are set forth in Section VI A, B and C.

149.    As a result of the Director Defendants' misconduct, the Company is suffering litigation expense and reputational harm in the marketplace in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

## COUNT THREE

### Against the Individual Defendants for Breach of Fiduciary Duties

150.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

151.    Each Individual Defendant owed to the Company fiduciary duties of loyalty and care.

152.    As set forth herein, each of the Individual Defendants violated and breached his or her fiduciary duties by, *inter alia*, failing/refusing to implement regulator-mandated remedial measures to MetLife's pension risk transfer business and failing to put in place and/or monitor a reasonable system and controls to ensure the identification of unresponsive and missing international group annuity annuitants and pension beneficiaries.

153.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein.   The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of MetLife.

154.    Also in breach of their fiduciary duties owed to MetLife the Individual Defendants willfully or recklessly made and/or cause the Company to make false and misleading statements.   As a result of the foregoing, MetLife's public statements were materially false and misleading at all relevant times.

155.    In further breach of their fiduciary duties owed to MetLife the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements.

156.    The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

157.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests and the officer defendant do not have a DCGL 108(b)(7) defense.

158.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties, MetLife has sustained and continues to sustain significant damages.

159.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

160.    Plaintiffs on behalf of MetLife have no adequate remedy at law.

### **COUNT FOUR**

**Against Individual Officer Defendants For Waste**

161.    Plaintiffs incorporate by reference and re-allege each and every allegation  set forth above, as though fully set forth herein.

162.    By their actions alleged above, and by failing to properly consider the interests of MetLife and its public stockholders by failing to conduct proper supervision, Defendants have caused the Company to waste valuable corporate assets by paying improper compensation and bonuses to liability or legal costs to defend Defendants' unlawful actions.

163.    As a result of the waste of the corporate assets, MetLife has sustained and will continue to sustain damages and injuries for which it has no adequate remedy at law.

164.    The acts of Defendants named herein, and each of them, were done maliciously, oppressively, and with intent to defraud, and Plaintiffs on behalf of MetLife are entitled to punitive and exemplary damages in an amount to be shown according to proof at the time of trial.

## COUNT FIVE

**For Breach Of Fiduciary Duty**
**Against The Executive Officer Defendants**
**Kandarian, Wheeler, Daniel, Morris, Hele, Goulart And Lenna**

165.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

166.    By reason of their positions as fiduciaries of the Company, the Executive Officer Defendants owed duties of good faith, loyalty, due care and truthful disclosure.  The Executive Defendants were all aware of and educated concerning the relevant laws and regulations concerning proper accounting practices, the 2012 Settlement and MetLife's beneficiary

identification policies and were duty-bound to abide by the laws and regulations and enforce compliance therewith.

167.    The Executive Officer Defendants consciously violated and breached these duties by causing MetLife to employ a deliberate and systematic business plan of superficial search for, and contact with beneficiaries of pensions in order to justify categorization of beneficiaries as "deceased" thereby justifying releases of hundreds of millions of dollars in reserves to boost reported earnings and MetLife's stock price and their own bonuses.

168.    The Executive Defendants authorized and implemented these policies and practices.

169.    As a direct and proximate result of the Executive Officer Defendants' breaches of fiduciary duty, the Company has sustained, and will continue to sustain, substantial harm, including the damages set forth herein.

170.    The Executive Officer Defendants are liable to the Company as a result of the acts alleged herein.

## COUNT SIX

### Against Individual Officer Defendants For Unjust Enrichment

171.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

172.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of MetLife.

173.    The Individual Defendants, based on improper conduct, received bonuses, stock options, or similar compensation from MetLife that was tied to the performance or artificially

inflated valuation of MetLife, received compensation that was unjust in light of the Individual Defendants' bad faith conduct, or received excessive compensation.

174.    Plaintiff, as a stockholder and a representative of MetLife seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

175.    Plaintiff on behalf of MetLife has no adequate remedy at law.

## COUNT SEVEN

### Against The Officer Defendants To Rescind Their Employment Contract Compensation Under Section 29(b) Of The Exchange Act

176.    Plaintiffs incorporate by reference and re-allege each and every preceding allegation set forth above, as though fully set forth herein.

177.    According to the United States Supreme Court in *Mills v. Electric Auto-Lite*, 356 U.S. 375, 386-87 (1970) (footnotes omitted):

> This language establishes that the guilty party is precluded from enforcing the contract against an unwilling innocent party.

178.    Exchange Act Section 29(b), 15 U.S.C. § 78cc(b), provides in pertinent part as follows:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder and every contract . . . heretofore on hereafter made the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this chapter or any rules or regulation thereunder, shall be void . . . as regards the rights of any person who in violation of any such provision, rule or regulation shall have made or engaged in the performances of contract.

179.    The Executive Officer Defendants violated provisions of The Exchange Act while performing their duties under various employment agreements and other contracts they entered into with MetLife.

180.    As a result of the foregoing MetLife is entitled to recession of those agreements and contracts and/or return of all monies and benefits previously paid thereunder.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of MetLife, and that Plaintiffs is an adequate representative of the Company;

B.    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to MetLife;

C.    Determining and awarding to MetLife the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

D.    Awarding MetLife restitution and disgorgement from the Individual Defendants, and each of them;

E.    Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court may deem just and proper.

Dated: April 29, 2019

**COOCH AND TAYLOR, P.A.**

*/s/ Blake A. Bennett*
Blake A. Bennett (#5133)

The Brandywine Building
1000 West Street, 10th Floor
Wilmington, DE  19801
(302) 984-3800

*Attorneys for Plaintiffs*

**OF COUNSEL**
SQUITIERI & FEARON, LLP
Lee Squitieri
32 East 57th Street
12th Floor
New York, New York 10022
(212) 421-6492

GARDY & NOTIS, LLP
Mark C. Gardy
126 East 56th Street, 8th Floor
New York, New York 10022
(212) 905 0509

*Attorney for Plaintiffs*